UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JONATHAN OZEK,                           *
                                         *
        Plaintiff,                       *
                                         *
        v.                               *        Civil Action No. 1:24-cv-10025-IT
                                         *
JETBLUE AIRWAYS CORP.,                   *
                                         *
        Defendant.                       *

<u>MEMORANDUM & ORDER</u>

November 13, 2025

TALWANI, D.J.

Plaintiff Jonathan Ozek brings this action against his former employer, Defendant JetBlue Airways Corporation ("JetBlue"), alleging three counts of employment discrimination on the basis of disability under M.G.L. c. 151B: disability discrimination (Count I), perceived disability discrimination (Count II), and retaliation (Count III). Pending before the court is JetBlue's <u>Motion for Summary Judgment</u> [Doc. No. 21].

The court heard argument from JetBlue's counsel at the November 3, 2025 hearing on the motion.[1] For the reasons explained below, the motion for summary judgment is GRANTED in part and DENIED without prejudice in part.

---

[1] Ozek's counsel did not appear at the hearing and JetBlue moved orally for dismissal of the case for failure to prosecute under Fed. R. Civ. P. 41(b). <u>See</u> Elec. Clerk's Notes [Doc. No. 36]. Plaintiff's counsel has not yet responded to that motion, which remains under advisement.

I.      **Factual Background Viewed in the Light Most Favorable to Ozek**

A.      **JetBlue's General Employment Practices at Boston Logan International Airport**

Boston Logan Airport is a noisy, chaotic, busy, and fast-paced environment. Pl.'s Resp. to Def.'s Statement of Material Facts ("SOF") ¶ 20 [Doc. No. 27].

Airport Operations Crewmembers at JetBlue "are expected to be the frontline of JetBlue's communication with Customers." Id. ¶ 20. They work at various customer-facing areas of the airport, principally the terminal gates, the ticket counter, and the baggage support office, with leaner staffing at the "Just Ask Desk" and the Airport Operations Support Base in an office that helps coordinate crewmembers in the performance of their roles. Id. ¶ 31; Ex. 11, Decl. of Jonathan Hall ("Hall Decl.") ¶ 7 [Doc. No. 22-11]; see also Ex. 13, Noemy Brito Dep. ("Brito Dep.") 12:11-14:21 [Doc. No. 22-13] (summarizing different "placements" for the role of a Crewmember). "The ability to communicate efficiently and effectively in person, by phone, and by handheld radio is an essential function of the [Crewmember] position in all five of these assignments." SOF ¶ 27 [Doc. No. 27].

JetBlue operates a seniority-based bid system, in which Airport Operations Crewmembers periodically submit their preferences for which airport "function/location (*i.e.*, gate, ticket counter, and baggage drop)," SOF ¶¶ 78–79 [Doc. No. 27], they "want to perform for the next 'bid' period (which typically lasts a few months)[,]" Hall Decl. ¶ 17 [Doc. No. 22-11]. The bidding system is based on Crewmembers' seniority, and the more senior a Crewmember is, the more likely they are to be scheduled for the airport function of their preference. SOF ¶¶ 78, 80 [Doc. No. 27].

"All newly hired Airport Operations Crewmembers begin working at the ticket counter." Hall Decl. ¶ 16 [Doc. No. 22-11]; see also Aff. of Jonathan Ozek ("Pl.'s Aff.") ¶ 7 [Doc. No. 27-

1] (ticket counter "is where all newly hired Crewmembers start"). The ticket counter function requires "assisting customers in person and via phone," "frequent handheld radio and telephone communication[,]" and "communicat[ing] and cooperat[ing] closely" with other Crewmembers. SOF ¶¶ 29–30, 32 [Doc. No. 27]. "If a newly hired Airport Operations Crewmember completes training at the ticket counter and successfully bids for another function (*e.g.*, gates), then they will begin training at that other function." Id. ¶ 77.

"Crewmembers working at the gates prepare the gates for departures, including by helping customers board the plane, organizing unaccompanied minors, disabled passengers and wheelchairs, handling any seat changes, and answering occasional phone calls." Id. ¶ 40. The gate function "is more fast-paced, chaotic, and time-sensitive than the other [Crewmember] functions" and "also involves a larger volume of telephone and radio communications." Id. ¶¶ 38–39, 41. Utilizing radios is a requirement for Crewmembers working at the gates. Id. ¶ 44. Working at the gates also requires being able to hear and respond to the "safety shoe" alarm system, which is triggered when a jet bridge is not properly connected to an aircraft. Id. ¶¶ 61, 67–70. The "safety shoe" alarm has both auditory and visual components, which are only visible if an individual is on the jet bridge and facing the jet bridge control panel. Id. ¶¶ 62–66. "[A]n Airport Operations Crewmember's failure to hear the jet bridge alarm would be a safety issue." Id. ¶ 72.

According to the job posting for the position, "Crewmembers will be required to perform and / or rotate through all Airport Operations related functions (gate, ticket counter, etc.)." Ex. 12, Airport Operations Crew Position Summary 1 [Doc. No. 22-12]; see Ex. 4, Pl.'s Dep. 142:15-143:7 [Doc. No. 22-4]. Based on operational needs and staffing levels, Airport Operations Crewmembers may be pulled from one assignment to another on any given shift,

including being sent to different functions or locations on short notice. SOF ¶¶ 49–50 [Doc. No. 27]. For the same reason, Crewmembers may also be constrained to perform their job duties alone at times. Id. ¶ 52.

**B.      Ozek's Medical Background**

Ozek is completely deaf in his right ear. SOF ¶ 4 [Doc. No. 27]. He is completely deaf in his left ear without the use of a hearing aid. Id. ¶ 5. His hearing impairment is permanent, Ex. 21, July 11, 2022 Accommodation Substantiation Form 1 [Doc. No. 22-21], and affects him in the major life activities of hearing and communicating, SOF ¶ 141 [Doc. No. 27]. Ozek also suffers from an "expressive language disorder" that causes him to take additional time to respond to questions. Id. ¶¶ 10–11.

**C.      Ozek Discloses His Disability, Commences Employment, is Accommodated During Training, and Successfully Passes His 90-Day Introductory Period at the Ticket Counter**

In January 2022, after Ozek disclosed his hearing loss to JetBlue, JetBlue hired Ozek as an Airport Operations Crewmember at Boston Logan Airport. Aff. of Jonathan Ozek ("Pl.'s Aff.") ¶¶ 3, 5 [Doc. No. 27-1]; SOF ¶ 19 [Doc. No. 27].

Ozek's offer letter, dated January 8, 2022, states: "After you complete classroom and on the job training, your 90 day introductory period will begin. Your performance will be evaluated after the 90 day introductory period ends to assess your potential for continued employment." Ex. 10, Offer Letter 2 [Doc. No. 22-10].

Beginning on January 19, 2022, and prior to reporting to Boston Logan Airport, Ozek attended a two-week training in Florida. Pl.'s Aff. ¶ 5 [Doc. No. 27-1]. On January 19, 2022, Ozek emailed JetBlue's ADA team about the "ADA Skills Checks or Online Exam." Ex. 20, Email Thread [Doc. No. 22-20]. His email noted that he is hearing impaired and that language

processing is a problem for him. Id. A JetBlue ADA Coordinator responded by suggesting a phone call. Id.

On January 27, 2022, Ozek responded by email, writing that "due to my hearing loss, I can't make a phone call." SOF ¶ 125 [Doc. No. 27]. In this email, he requested extra time on a 'skill check' [examination] due to his 'hearing loss' and 'language processing' difficulties." Id. ¶ 124. That same day, the ADA Coordinator replied to Ozek's email "and asked for medical documentation to substantiate the request." Id. ¶ 126. Ozek wrote back the same day that he could not immediately provide the documentation as he was at the training and not in Boston, and did not know in advance that he would need medical documentation. Ex. 19, Email Thread at 870 [Doc. No. 22-19]. He asked what else could be done as to his request; the record shows no response from JetBlue. Id.

Ozek did not send in medical documentation while he was training in Florida. SOF ¶ 128 [Doc. No. 27]. Nonetheless, Ozek was granted the requested accommodation of extra time to take his skill check examination. Id. ¶ 129.

In late January or early February 2022, after passing all required examinations, Ozek began working at Boston Logan Airport as an Airport Operations Crewmember at the pre-security ticket counter function. Pl.'s Aff. ¶¶ 6–7 [Doc. No. 27-1].

On February 8, 2022, the ADA Coordinator documented by email to Ozek that JetBlue became aware on January 27, 2022, of his medical condition that may require a work accommodation under the ADA, namely, additional testing time, and requested additional documentation "as part of the process to assist [him] with [his] request[.]" Ex. 19, Email Thread at 869 [Doc. No. 22-19]. Ozek did not respond or seek further accommodation while at the ticket counter function. SOF ¶ 128 [Doc. No. 27].

Ozek remained at the ticket counter function through the 90-day introductory period and continuing to early June 2022. SOF ¶ 89 [Doc. No. 27]. Ozek had "no issues" working at the ticket counter and had no need to request an accommodation for his hearing loss. Pl.'s Aff. ¶ 7 [Doc. No. 27-1]. He was never disciplined or warned, in any way, about poor performance or an inability to do this job. Id.

While working at the ticket counter function, Ozek's job duties were to check in customers, scan their luggage, and help them at the kiosk. Pl.'s Dep. 30:6–12 [Doc. No. 22-4]. His duties did not include phone calls with customers, as "[t]here is no phone number for a customer to call to speak directly to a ticketing agent or a gate agent[.]" Pl.'s Aff. ¶ 15 [Doc. No. 27-1]. His duties did include making phone calls to assist customers; because his hearing loss prevented him from using the work phone, JetBlue had provided him with a phone number to call others at JetBlue from his own phone, which is connected via Bluetooth to his hearing aid if necessary for JetBlue duties; for example, if there was a problem with a customer's ticket, he would use his own phone to call whomever he needed for the situation. Id. at 30:16-24, 31:12-15; 31:24-32:5. If an internal call was received at the ticket counter, he would ask a co-worker to help. Id. at 33:1–8.

### D.    Reassignment to Gates

On June 6, 2022, after a successful bid for reassignment to the gates function, Ozek began training at the gates. SOF ¶ 89 [Doc. No. 27].

#### 1.    Request for Accommodations at the Gates

On June 10, 2022, Ozek emailed JetBlue's ADA team: "[J]ust recently, I've moved to Gates" and "[t]he past few days has [sic] been challenging for me because of my hearing loss. . . . What was so difficult was the walkie talkie and the phone call. I have a[n] additional piece for the walkie talkie that I requested for, but it's not enough." SOF ¶ 131 [Doc. No. 27]. In

a June 16 follow-up call with JetBlue's ADA team, Ozek reported difficulty communicating with fellow Crewmembers using the walkie-talkie radio and requested an accommodation. Id. ¶ 137.

On July 11, Ozek signed a medical authorization and release form for purposes of JetBlue's inquiry into his request for a reasonable accommodation. Ex. 21, Medical Records at 1249 [Doc. No. 22-21]. On July 13, Ozek emailed JetBlue's ADA team medical documentation from his audiologist, which confirmed that he had severe hearing loss and was affected in the major life activities of hearing and communicating. SOF ¶¶ 140–41 [Doc. No. 27]. The audiologist, Dr. Kelley Glass, suggested the following accommodations: "closed caption- TTY phone at gates or call his cell phone to communicate with him as it is connected via Bluetooth to his hearing aid. Jonathan's hearing aid has Bluetooth in it and will pair to any iPhone directly. You could provide him with an Apple iPhone or iPad or allow him to use his personal phone while at work. You could also text him on his phone so he can read what is said." Id. ¶ 142.

On July 14, JetBlue's ADA team and Ozek discussed by phone his accommodation request in more detail. Id. ¶ 144.

During this time, Ozek was not authorized to work the jet bridge and so, while working at the gates, he would notify his supervisor to have an authorized Crewmember handle the jet bridge for him. Pl.'s Dep. 47:6-24, 96:7-16, 147:2-7 [Doc. No. 22-4].

Around July 2022, JetBlue's ADA team granted Ozek's request and provided him with a Bluetooth-compatible handheld radio that could pair to his hearing aid. SOF ¶ 145 [Doc. No. 27]. JetBlue's ADA team also provided Ozek a shoulder microphone to use with the radio to amplify his hearing. Id. ¶ 146.

In August, Ozek notified JetBlue's ADA team that his radio was not working properly and requested information about Bluetooth pairing. Id. ¶ 147. On August 31, JetBlue's ADA

team sent him the instructions to the radio and the manufacturer's contact information to troubleshoot issues he was having with it. Id. ¶ 148. He did not call the manufacturer for guidance. Id. ¶ 149. He did not take the handheld radio to his audiologist to attempt pairing it with his hearing aid, and was never told that he could not do so. Pl.'s Dep. 58:3–13 [Doc. No. 22-4].

### 2. JetBlue's ADA Team Speaks with Dr. Glass

On August 17, 2022, after receiving reports of performance and potential safety issues, a JetBlue ADA Analyst spoke to Ozek's supervisors. SOF ¶ 156 [Doc. No. 27].

On August 31, in light of the issues raised and to better understand Ozek's medical condition and restrictions, the JetBlue ADA Analyst spoke with Ozek's audiologist, Dr. Glass. Id. ¶ 187. During that conversation, the JetBlue ADA Analyst explained the essential functions of the Crewmember role. Id. ¶ 189. Dr. Glass stated, among other things, that a noisy environment is difficult for Ozek because of his hearing impairment. Id. ¶ 188.

### 3. JetBlue's Determination Regarding Ozek's Ability to Perform the Duties of the Crewmember Position

On September 13, 2022, JetBlue's ADA Analyst emailed Dr. Glass a copy of JetBlue's job description for the Crewmember position and a summary of the JetBlue ADA Analyst's understanding of Dr. Glass's medical opinion concerning Ozek's restrictions and her proposed accommodations. Id. ¶¶ 194–196. The Analyst's email stated:

> You explained that Jonathan has severe hearing loss which he uses a hearing aid for, however, his range of hearing even with the hearing aid depends on the volume and pitch of the sound and how noisy the environment is. We discussed the patient[']s ability to hear alarms and or customers and you explained that a noisy environment like an airport can be very challenging for him to hear and perform in. You also suggested that the patient remain in a role with a partner who can assist him should an emergency occur and there are no visual indicators or be transitioned into another role in which he does not have to depend on his hearing as much.

Id. ¶ 195. Dr. Glass replied, confirming that JetBlue's ADA Analyst had "understood everything correctly." Id. ¶ 197.

On September 29, 2022, the JetBlue ADA Analyst called Ozek. Id. ¶ 198. Her notes from that call state in part:

> I reached out to the CM [Crewmember] to explain his doctor's statements about his condition: 1- He would need a partner at all times 2- Nois[]y environments such as airports would cause a challenge related to his condition. 3- He should work in a role that does not heavily rely on hearing. CM was upset and I had to repeat the information multiple times.

Id. ¶ 199.

That same day, JetBlue's ADA team emailed Ozek that he would be unable to return to the Crewmember position, Ex. 37, Sept. 29, 2022 Email from JetBlue's ADA Team to Ozek [Doc. No. 22-37], because JetBlue had determined that he could not perform the essential functions of the position with or without a reasonable accommodation, Brito Decl. ¶ 48 [Doc. No. 22-2]. The email stated that the decision was "[b]ased on Ozek's own statements about his restrictions, Ozek's colleagues' reports of performance and safety-related issues, and Dr. Glass's medical opinion." Id.; see also Ex. 40, Oct. 2022 Email Thread [Doc No. 22-40].

### E. Unpaid Leave and Further Medical Reports

#### 1. Initial Communications Between JetBlue's ADA Team and Ozek Regarding "Position Reassignment" and Ozek's Placement on Unpaid Medical Leave

JetBlue's ADA Analyst's notes from September 29, 2022, state further that she "offered [position reassignment] if the CM wishes to accept." SOF ¶ 199 [Doc. No. 27]; see also Brito Dep. ¶ 53 [Doc. No. 22-2]. "Position reassignment" is "an unpaid leave . . . that allows [Crewmembers] the opportunity to find a position within JetBlue that meets [their] doctor's restrictions and recommendations." SOF ¶ 255 [Doc. No. 27]. This unpaid leave "is typically a three-month accommodation[,]" which "ADA Compliance will typically extend . . . once (for a

total of six months) if a Crewmember is unable to secure a position within the initial three month period." Id. ¶¶ 209–10.

On September 30, 2022, Ozek declined the offer of unpaid leave and requested to remain in the Crewmember position which he stated he could perform without any accommodations. Id. ¶¶ 213–14. On October 3, 2022, JetBlue removed Ozek from active duty and placed him on an unpaid medical leave of absence, asserting that this removal was based on the ADA team's determination that Ozek could not perform the essential functions of the Crewmember role. Id. ¶¶ 215–216.

On October 6, Ozek requested that he be removed from the medical leave of absence that he had not requested so that he could bid for a new Crewmember assignment. Ex. 40, October 6–10, 2022 Email Thread 937 [Doc. No. 22-40]. The next day, JetBlue's ADA Coordinator reiterated JetBlue's reasons for removing Ozek from the Crewmember position and repeated the offer of an unpaid leave to seek another position. Id. at 936. She requested his response by October 12. Id. at 937.

Ozek responded the same day stating that he understood that some employees have remained at the ticket counter function without bidding on other positions and that another employee with severe hearing loss was given accommodations at "JetBlue JFK[.]" Id. at 936. He again requested to be permitted to remain in his position. Id.

### 2. Further Correspondence with Dr. Glass

Around this time, Ozek also contacted Dr. Glass regarding JetBlue's decision and his desire to return to his role as Crewmember. SOF ¶¶ 225, 232 [Doc. No. 27].

On October 11, 2022 Dr. Glass, in turn, emailed the ADA Analyst and inquired about JetBlue's decision to remove Ozek from work, stating that she had not said that Ozek "could not perform at his job." Id. ¶ 228. Dr. Glass and the ADA Analyst exchanged emails regarding

Ozek's medical restrictions and his ability to perform the essential functions of the Crewmember role. See id. ¶¶ 228–30, 234–36. In response to questions regarding those topics, Dr. Glass stated that it was "difficult to answer the questions in an absolute yes/no fashion as there are many factors that will contribute to how a person will hear in different environments." Ex. 42, Oct. 24, 2022 Email from Dr. Glass to Noemy Brito at 53 [Doc. No. 22-42]; SOF ¶ 235 [Doc. No. 27].

Dr. Glass recommended that Ozek undergo a "functional gain test with his hearing aid[] in to see how he is hearing with noise present and without noise." SOF ¶ 235 [Doc. No. 27]. Dr. Glass scheduled Ozek for such testing with Dr. Eva Bero, another audiologist. Id. ¶ 235, 240.

### 3. Functional Gain Assessment with Dr. Bero

On or about November 21, 2022, Dr. Bero performed a functional gain assessment of Ozek's hearing. SOF ¶ 241 [Doc. No. 27]. The assessment results showed that Ozek "was completely deaf in his right ear; and that, even while wearing his hearing aid in his left ear, he had 'limited speech perception of 32% of sentence understanding at typical conversational speech level' and that speech perception dropped to '3% correct in presence of speech babble background noise.'" Id. ¶ 245.

On December 12, in response to questions from JetBlue's ADA Coordinator concerning Ozek's ability to safely perform the Crewmember job, Dr. Bero indicated that Ozek "would have difficulty performing the following job functions without accommodation: use of 'handheld radios and microphones to communicate with operations and make all terminal announcements,' 'handheld radios,' and 'subject to weather and elevated noise levels within airports.'" Id. ¶¶ 246–47. Dr. Bero wrote that "increased noise levels in the airport environment would make it difficult to hear for communication without additional supports of use of facial cues and/or speech-to-text technologies" and, further, that "speech perception with hearing only with a customer wearing a standard surgical type mask is expected to be limited.'" Id. ¶ 248.

On December 20, 2022, JetBlue's ADA team emailed Ozek memorializing the team's receipt of medical opinions from Drs. Glass and Bero. Id. ¶ 253. In that email, the ADA team stated that based on those opinions and the concerns from Ozek's supervisors, they were unable to grant his request to work as a Crewmember "as it would pose safety related concerns" and "would require the removal of essential functions of the . . . role." Id. ¶ 254.

### 4.    Acceptance of "Position Reassignment"

JetBlue's ADA team again offered Ozek unpaid leave while seeking other JetBlue positions, which he accepted on December 21, 2022. Id. ¶¶ 255, 257. His period of unpaid leave was later extended to June 22, 2023. Id. ¶ 283.

### F.    Applications During the Unpaid Leave

During the unpaid leave for "Position Reassignment," JetBlue's ADA team requests that JetBlue's Talent Acquisition Team schedule an interview for the Crewmember for any role for which the Crewmember applies and meets the minimum qualifications. Id. ¶ 212. Crewmembers on this unpaid leave still must "compete with other qualified candidates." Ex. 49, Dec. 21, 2022 Email Thread at 110 [Doc. No. 22-49]. If a Crewmember does not secure a position during this unpaid leave, the Crewmember's employment with JetBlue ends. SOF ¶ 258 [Doc. No. 27].

Between December 2022 and June 2023, Ozek applied to 26 open positions. Ex. 50, Carrie Merida Decl. ("Merida Decl.") ¶ 16 [Doc. No. 22-50]; Pl.'s Dep. 225:4–8 [Doc. No. 22-4]; Ex. 51, Chart of Pl.'s Applications [Doc. No. 22-51].

JetBlue's ADA team "ensured that Plaintiff received an interview for every role to which he applied and for which he met the minimum qualifications," except for eleven positions where JetBlue found that he "was not as competitive as other applicants." SOF ¶ 263 [Doc. No. 27]; Ex. 50, Merida Decl. ¶ 20 [Doc. No. 22-50]; see also Ex. 51, Chart of Pl.'s Applications [Doc. No. 22-51]. JetBlue offered Ozek three interviews. SOF ¶¶ 299–300 [Doc. No. 27]. For the

remaining twelve positions, JetBlue did not offer Ozek interviews because he failed to meet the minimum qualifications, was otherwise ineligible, or the position was filled before he was considered. See id. ¶ 289 (failed to meet minimum qualifications for 4 positions); id. ¶ 293 (requisitions cancelled for 4 positions); id. ¶ 295 (filled before Ozek could be considered for 2 positions); id. ¶¶ 296–98 (Ozek ineligible for consideration for 2 positions).

On March 22, 2023, Ozek interviewed for the Specialist Baggage Recovery role. Id. ¶ 300. He "was deemed . . . competitive enough to be placed in a pool" from which, "[i]n the event there was an opening, JetBlue would reach out to Plaintiff and offer him the position." Merida Decl. ¶ 27 [Doc. No. 22-50]; SOF ¶¶ 302–03 [Doc. No. 27].

On May 24, 2023, Ozek interviewed for the Coordinator Badge role. SOF ¶ 305 [Doc. No. 27]. The interviewer did not recommend Ozek for the role after evaluating Ozek's candidacy on seven proscribed metrics. Ex. 62, Pl.'s Badge Coordinator Interview Results [Doc. No. 22-62]. Because Ozek was therefore deemed "not as competitive" as other interviewees, Ex. 51, Chart of Pl.'s Applications [Doc. No. 22-51], JetBlue did not offer him this position. Ex. 50, Merida Decl. ¶ 26 [Doc. No. 22-50].

Ozek was offered an interview for the Coordinator Accounting and Scheduling role but did not appear for this interview. SOF ¶ 299 [Doc. No. 27].

JetBlue did not hire Ozek for any of the roles for which he applied. Id. ¶ 312.

### G.    Ozek's Termination

On June 22, 2023, after six months of unpaid leave, Ozek was "administratively separated" from JetBlue. SOF ¶ 312 [Doc. No. 27]. JetBlue's stated reasons for the termination were that: (1) "he had not obtained another position with JetBlue during position reassignment"; (2) "JetBlue had determined that [he] was permanently restricted from performing the essential

functions" of the Crewmember role; and (3) "JetBlue was unable to provide [him] with indefinite leave." Id.; see Ex. 63, Termination Letter [Doc. No. 22-63].

Throughout his time working at JetBlue, "[n]o coworker or supervisor at JetBlue ever insulted [Ozek's] ability to hear or communicate" or "ever made a statement about [his] hearing loss[.]" SOF ¶¶ 320–21 [Doc. No. 27].

## II.    Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 314. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on

14

file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. <u>Anderson</u>, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." <u>Anderson</u>, 477 U.S. at 255.

### III.    Discussion

#### A.    Counts I–II: Disability Discrimination and Perceived Disability Discrimination

The court addresses Counts I (disability discrimination) and II (perceived disability discrimination) together because "[c]laims of handicap discrimination, including a perception of ('regarded as') impairment, proceed" under the same analytical framework, <u>City of New Bedford v. Massachusetts Comm'n Against Discrimination</u>, 440 Mass. 450, 461, 799 N.E.2d 578 (2003), and because JetBlue does not dispute that Ozek can establish that he is disabled, <u>see</u> Def.'s Mem. ISO Mot. for Summ. J. ("Def.'s Mem.") 16 n.13 [Doc. No. 24].

##### 1.    Hostile Workplace and Disparate Treatment

Because Ozek fails to respond to JetBlue's motion as to the hostile workplace and disparate treatment aspects of his claims, <u>see</u> Def.'s Mem. 16–18 & n.11 [Doc. No. 24], those claims are deemed waived. <u>See</u> <u>Schneider v. Local 103 I.B.E.W. Health Plan</u>, 442 F.3d 1, 3 (1st Cir. 2006) (per curiam) ("[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived.").

JetBlue's motion is therefore GRANTED as unopposed as to the hostile workplace and disparate treatment aspects of Counts I and II.

### 2. Failure to Accommodate

#### a. Legal Framework

Chapter 151B forbids an employer from "discriminat[ing] against, because of his handicap, any person alleging to be a qualified handicapped person[.]" M.G.L. c. 151B, § 4(16). Under Chapter 151B, "an employer is required to provide an employee with a known disability a reasonable accommodation that will enable her 'to perform the essential functions of [her] job' unless the accommodation would cause the employer undue hardship." Stratton v. Bentley Univ., 113 F.4th 25, 52 (1st Cir. 2024) (quoting Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119, 928 N.E.2d 327 (2010)). The plaintiff "must show that he is 'handicapped' within the meaning of the statute; that he is a 'qualified handicapped person' capable of performing the essential functions of his job either without accommodation or with a reasonable accommodation; and that he was subject to an adverse employment action because of his handicap." Godfrey, 457 Mass. at 120; see also M.G.L. c. 151B, § 1(16) (defining "qualified handicapped person" as "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap").

An "essential function is a fundamental job dut[y] of the employment position the individual with a disability holds[.]" Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 157 (1st Cir. 2009) (internal citations and quotation marks omitted). Determining whether a particular function is "essential" under Chapter 151B is "an individualized inquiry." See Massacani v. Kelly Servs., Inc., 2018 WL 443448, at *6 (D. Mass. Jan. 16, 2018) (citing Godfrey, 457 Mass. at 121). While the First Circuit "generally give[s] substantial weight to the

employer's view of job requirements in the absence of evidence of discriminatory animus, it is only one factor in the [essential functions] analysis." Ward v. Massachusetts Health Rsch. Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000) (internal citation omitted). Other factors to be considered include, but are not limited to, "written job descriptions, consequences of not requiring the function, work experience of past incumbents, and work experience of current incumbents." Id.; see also Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 383–84, 607 N.E.2d 1035 (1993) ("Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved.").

Ozek bears the burden of proving the existence of a reasonable accommodation that would have enabled him to perform the essential functions of the Crewmember position. See Godfrey, 457 Mass. at 120. He must "show not only that the proposed accommodation would enable [him] to perform the essential functions of [his] job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001).[2]

An employer is not required to "accommodate a disability by foregoing an essential function of the position[.]" Kvorjak v. Maine, 259 F.3d 48, 57 (1st Cir. 2001); see also St. Laurent v. United Parcel Serv., Inc., 416 F. Supp. 2d 212, 223 (D. Mass. 2006) ("[U]nder both Federal and Massachusetts law, 'reasonable accommodation does not include waiving or excusing an inability to perform an essential job function.'") (quoting Cox, 414 Mass. at 390).

---

[2] Although the claims in Reed arose under the Americans with Disabilities Act ("ADA"), the same standard is applied to disability discrimination claims under Chapter 151B. See Mekonnen v. OTG Mgmt., LLC, 394 F. Supp. 3d 134, 155 (D. Mass. 2019), aff'd, 2021 WL 1110915 (1st Cir. Mar. 23, 2021); see also Henry v. United Bank, 686 F.3d 50, 58–59 (1st Cir. 2012) ("[a]s Chapter 151B is considered the state analogue to the [ADA], Massachusetts courts look to cases decided under the federal counterpart to inform its interpretation").

And an employer "need not . . . reallocate essential functions to other employees," Phelps v. Optima Health, Inc., 251 F.3d 21, 26 (1st Cir. 2001), nor create a new position for the employee, Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 454, 772 N.E.2d 1054 (2002). The Massachusetts Supreme Judicial Court has held that "the Massachusetts statute is less generous than the ADA" in that it does not require reassignment to vacant positions as a reasonable accommodation. Russell, 437 Mass. at 454; M.G.L. c. 151B, § 4(16) (barring dismissal of employees who are "capable of performing the essential functions of the position involved with reasonable accommodation") (emphasis added).

**b. Performance of Essential Functions With or Without a Reasonable Accommodation**

JetBlue argues that Ozek is not capable of performing the essential functions of his job, with or without a reasonable accommodation. Ozek does not argue that he was capable of performing the essential functions of an Airport Operations Crewmember at the gates function.[3] Instead, he argues that he can perform the essential functions of an Airport Operations Crewmember at the ticket counter function and that a transfer back to that function would have been a reasonable accommodation. He also argues that JetBlue failed to provide him with a reasonable accommodation when it refused to further extend his position reassignment beyond the extended six-month period.

_____

[3] His arguments about JetBlue's failure to engage in an interactive process with him by not resolving his issues with pairing the Bluetooth-compatible handheld radio ADA Compliance provided, Pl.'s Opp. 5–6 [Doc. No. 28], are unavailing because unlike the ADA, "there is no such requirement [to engage in the interactive process] under Massachusetts law in chapter 151B." Sullivan v. Raytheon Co., 262 F.3d 41, 48 (1st Cir. 2001).

###### i.        Request to Transfer Back to the Ticket Counter Function

Ozek argues that JetBlue failed to offer him a reasonable accommodation by not transferring him back to the ticket counter, where he had performed his duties without issue for four and a half months. Pl.'s Opp. 7 [Doc. No. 28]. Although the Massachusetts Supreme Judicial Court has held that an employer is "under no obligation to create a new position for the plaintiff" as an accommodation, it also recognized in the same case that the "plaintiff never requested to return to her former position as an admitting assistant, nor did she indicate that she would be able to perform the essential functions of that position with accommodation." Russell, 437 Mass. at 454; see Morrill v. Lowe's Home Ctrs., LLC, 2022 WL 2168479, at *5 (Mass. Super. Apr. 19, 2022) ("The clear implication of the language from Russell cited above is that, had the plaintiff in that case sought a return to her former position as an admitting assistant, her employer would have been required to evaluate that request as a reasonable accommodation.").

Ozek has met his burden of producing evidence from which a jury could find that he was qualified to perform the essential functions of the Crewmember position at the ticket counter function, and that a transfer back to the ticket counter would have been a reasonable accommodation. Although a "plaintiff may not rely on past performance to establish that he is a qualified individual without accommodation when there is undisputed evidence of diminished or deteriorated abilities[,]" Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 80 (1st Cir. 2010), there is no record evidence of diminished or deteriorated abilities during Ozek's time working at the ticketing counter. And although the medical opinions of his doctors suggest that he may be unable to perform the job based on assessments in controlled environments, a jury could reasonably find that he did perform the job based on the fact that he held the position for

four and a half months and no disciplinary issues or complaints were raised during that time—including during the 90-day introductory period after he commenced employment.[4]

JetBlue's argument that reassignment back to the ticketing counter would require JetBlue to override its "seniority-based assignment system," Def.'s Mem. 15 [Doc. No. 24], is not supported with any evidence as to the details of the "seniority-based assignment system." Without those details, JetBlue has not explained why Ozek would not secure such a position under the seniority-based assignment system, if permitted to bid, where the most junior Airport Operations Crewmembers begin at the ticketing counter and Ozek would have seniority over any new employees vying for the same position.

To the extent JetBlue argues that reassignment <u>only</u> to the ticketing counter would mean substantially modifying the essential functions of the role by not requiring Ozek to rotate to other roles, a jury could reasonably find that rotation was not in fact an essential function of the role. <u>See</u> <u>Cox</u>, 414 Mass. at 384 (determining the essential functions of a role "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved") (internal quotations omitted). Notwithstanding the job description and declarations reciting a general policy, the record contains no specific examples of Airport Operations Crewmembers at the ticket counter being rotated into other roles prior to successfully bidding on them. This did not occur during Ozek's

---

[4] JetBlue also argues that the transfer is unreasonable to the extent it would reallocate Ozek's "job function of answering Customer phone calls to his colleagues." Def.'s Mem. 15 n.10 [Doc. No. 24]. The record is ambiguous as to Crewmembers answering any customer-initiated phone calls and common experience undermines the notion that Airport Operations Crewmembers routinely answer customer phone calls. In any event, Ozek asserts that he never spoke by phone with any customers at the ticketing counter, Pl.'s Aff. ¶ 15 [Doc. No. 27-1], and a jury could reasonably interpret his deposition testimony to be consistent with this Affidavit in light of the ambiguous line of questioning. <u>See</u> Pl.'s Dep. 143:13–17 [Doc. No. 22-4].

time working at the ticket counter, and the record demonstrates that an employee would be trained at another role, for example gates, only <u>after</u> bidding into that role.

Accordingly, JetBlue's <u>Motion for Summary Judgment</u> [Doc. No. 21] is DENIED as to the failure to accommodate argument as to Ozek's request to be transferred back to the ticketing counter.

### ii.      Request for Extended Leave to Pursue the Specialist Baggage Recovery Position

Ozek argues that extending his period of unpaid leave until a Specialist Baggage Recovery position opened would have been a reasonable accommodation because he had been placed in a pool of eligible candidates for that position. Pl.'s Opp. 9–10 [Doc. No. 28]. However, the reasonable accommodation analysis under Chapter 151B concerns "the position involved[,]" M.G.L. c. 151B, § 4(16), and does not require an employer to transfer an employee to a different position. <u>Russell</u>, 437 Mass. at 454. Because the Specialist Baggage Recovery Position is a different position from the Airport Operations Crewmember position, an extension of his position reassignment period would not have been a "reasonable accommodation" under Chapter 151B.

Because an extension of position reassignment was not a reasonable accommodation, JetBlue's <u>Motion for Summary Judgment</u> [Doc. No. 21] is GRANTED as to that request.

### B.     Count III: Retaliation

Retaliation is a "separate and independent cause of action." <u>Wright v. CompUSA, Inc.</u>, 352 F.3d 472, 477 (1st Cir. 2003) (quoting <u>Abramian v. President & Fellows of Harvard Coll.</u>, 432 Mass. 107, 121, 731 N.E.2d 1075 (2000)). To succeed on a claim of retaliation, a plaintiff must "show that: (1) he engaged in conduct protected under Massachusetts or federal law; (2) he suffered an adverse employment action; and (3) a causal connection existed between the

protected conduct and the adverse action." <u>Sullivan</u>, 262 F.3d at 48 (internal citations and quotation marks omitted). The plaintiff cannot rely "merely upon conclusory allegations, improbable inferences, and unsupported speculation" to avoid summary judgment. <u>See</u> <u>Feliciano de la Cruz v. El Conguistador Resort & Country Club</u>, 218 F.3d 1, 5 (1st Cir. 2000) (internal citation omitted). "Once the plaintiff has made a prima facie showing, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision." <u>McMillan v. Massachusetts Soc. for Prevention of Cruelty To Animals</u>, 140 F.3d 288, 309 (1st Cir. 1998) (internal citation omitted). "If the defendant does so, the plaintiff must show that the defendant's proffered reason was not, in fact, the real reason for the decision and that the decision was the result of the defendant's retaliatory animus." <u>Id.</u>

Ozek bases his retaliation claim on events occurring after he reached out to ADA Compliance in June 2022 to request a Bluetooth-compatible handheld radio as an accommodation. He argues that he suffered adverse employment actions when JetBlue (1) "did not select him for the position of Specialist Baggage Recovery" and (2) terminated his employment after the expiration of his six months of position reassignment. Pl.'s Opp. 11–12 [Doc. No. 28]. Ozek argues that the causal link was supplied by the fact that "ADA Compliance was communicating with Talent Acquisition, and therefore Talent Acquisition knew that [he] was a part of JetBlue's Position Reassignment program on the basis of disability." <u>Id.</u> at 11.

The court finds these facts sufficient to support a prima facie case of retaliation and to shift the burden to JetBlue to articulate non-retaliatory justifications for the adverse employment actions.

### 1. Specialist Baggage Recovery Position

As to passing over Ozek for the Specialist Baggage Recovery position, JetBlue's proffered justification was that Ozek was deemed not as competitive as another candidate but

was sufficiently competitive to be included in a pool of eligible candidates for the next available opening. Merida Decl. ¶ 27 [Doc. No. 22-50]. Ozek disputes this justification, stating that "[t]here is nothing in the record that establishes who was hired instead of Plaintiff and whether that person was more or less qualified than Plaintiff." Pl.'s Opp. 11 [Doc. No. 28]. But he offers no evidence supporting an inference that the real reason he was passed over for the position was JetBlue's discriminatory animus. He therefore fails to satisfy his burden of showing that he was not hired for the Specialist Baggage Recovery position because of pretext or discriminatory animus, particularly where Ozek admits that "[n]o coworker or supervisor at JetBlue ever insulted [his] ability to hear or communicate" or "ever made a statement about [his] hearing loss[.]" SOF ¶¶ 320–21 [Doc. No. 27].[5]

Accordingly, JetBlue's <u>Motion for Summary Judgment</u> [Doc. No. 21] is GRANTED as to retaliation based on JetBlue not hiring Ozek for the Specialist Baggage Recovery position.

### 2. Termination

As to his administrative separation, JetBlue's stated reasons were that Ozek could not perform the essential functions of the Airport Operations Crewmember role and had exhausted the six months of position reassignment without having obtained another position. Brito Decl. ¶¶ 92, 95 [Doc. No. 22-2]. However, as explained above, a jury could reasonably find that Ozek

---

[5] Ozek cites <u>U.S. Airways, Inc. v. Barnett</u>, 535 U.S. 391, 397 (2002), for the proposition that "[b]y definition any special 'accommodation' requires the employer to treat an employee with a disability differently, *i.e.*, preferentially." But <u>Barnett</u> arose under the ADA and does not support the implication that Ozek was required to be treated preferentially for the Specialist Baggage Recovery position and that the failure to so treat him is evidence of pretext or discriminatory animus. To the contrary, as explained above, Chapter 151B does not require an employer to transfer a handicapped employee to a vacant position. <u>Russell</u>, 437 Mass. at 454.

could perform the essential functions of the Airport Operations Crewmember role at the ticket counter, and that a transfer back to that role would have been a reasonable accommodation.

Accordingly, JetBlue's Motion for Summary Judgment [Doc. No. 21] is DENIED as to retaliation based on JetBlue failing to transfer Ozek to the ticket counter function and instead terminating his employment.

## IV.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. No. 21] is GRANTED as unopposed as to hostile workplace and disparate treatment under Counts I and II, GRANTED as to the request for extended leave under Counts I and II, and GRANTED as to being passed over for the Specialist Baggage Recovery position under Count III. The motion is DENIED as to the request for a transfer back to the ticketing counter under Counts I, II, and III. This order is without prejudice to JetBlue filing a renewed motion for summary judgment relating to the transfer back to the ticket counter function with supplemental record evidence as to JetBlue's rules regarding bidding on the ticket counter function, the actual practice at Boston Logan Airport regarding such bidding, and the rotation of ticket counter employees to other functions prior to successfully bidding out of that function. Any such motion must be filed within 30 days of this order.

IT IS SO ORDERED.

November 13, 2025                    /s/ Indira Talwani
                                     United States District Judge